**SOUTHERN OHIO COAL COMPANY, Plaintiff,**

v.

**OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, DEPARTMENT OF THE INTERIOR, et al., Defendants.**

No. C2–93–751.

United States District Court, S.D. Ohio, E.D.

Aug. 19, 1993.

D. Michael Miller, Alvin J. McKenna, Mark S. Stemm, Janet J. Henry, Charles H. Cooper, Christopher C. Russell, Porter Wright Morris & Arthur, Columbus, OH, for plaintiff.

Joshua Levin, Phil Brooks, Steven Ellis, EPA, Pamela West, OSM, Wayne Babcock, Interior, Leonard Gellman, Anita Cicero, Gary Pritchard, David Mulka, EPA, James Rattan, Asst. U.S. Atty., Dan Schrum OSM, Washington, DC, for defendants.

## PRELIMINARY INJUNCTION ORDER

BECKWITH, District Judge.

This matter is currently before the Court for consideration of the motion of the United States Environmental Protection Agency (hereinafter referred to as "USEPA") to vacate this Court's August 4, 1993 Order temporarily restraining USEPA from acting in any manner with regard to the flooding at Plaintiff's Meigs Mine Number 31 (hereinafter referred to as "Meigs 31") in Meigs County, Ohio. In this Order, the Court also addresses Plaintiff's motion for an order preliminarily enjoining USEPA and the Office of Surface Mining Reclamation and Enforcement, Department of the Interior (hereinafter referred to as "OSM") from acting to cause a cessation or delay of the evacuation of water from Meigs 31, unless the Ohio agencies approved to enforce the applicable federal and state statutes fail to act as charged by these statutes.

### BACKGROUND

Prior to July 11, 1993, Plaintiff ceased mining operations in its Raccoon Mine Number 3 (hereinafter referred to as "Raccoon 3"). Raccoon 3 is adjacent to Meigs 31 and is at a higher underground elevation than Meigs 31. In order to prevent naturally occurring water in Raccoon 3 from flooding into Meigs 31 through the opening that con-

nects the two mines and in order to permit pumping of such naturally occurring water from Meigs 31 into Raccoon 3, Plaintiff constructed a bulkhead between the two mines. That bulkhead was designed to completely seal the opening between the two mines, except to permit pumping water from Meigs 31 to Raccoon 3. Plaintiff caused the bulkhead to be designed to a strength of ten times the maximum pressure created by the water in Raccoon 3 at the opening between the two mines.

On July 11, 1993, Meigs 31 was inundated with an estimated one billion gallons of water from Raccoon 3. As of August 12, 1993, the cause of the inundation had not been conclusively established and may or may not have been a failure of the bulkhead. Because the water from Raccoon 3 occupied approximately thirty to fifty percent of Meigs 31, Plaintiff immediately began investigating alternatives for evacuating Meigs 31.

Plaintiff's alternatives for evacuating Meigs 31 were limited by three primary factors. The first factor complicating evacuation was that the normal method of evacuating water from Meigs 31 was through the bulkhead into Raccoon 3. Because the structural integrity of the bulkhead could not be ascertained, Plaintiff could not rely upon the bulkhead or Raccoon 3 as a repository for water evacuation. The second complicating factor was the volume of water occupying Meigs 31. As of July 11, 1993, Plaintiff did not have a method for evacuating more than a few million gallons of water per day from Meigs 31. Accordingly, new methods were required for the evacuation. Finally, the chemical constitution of the water raised environmental concerns related to the evacuation.

The water occupying Meigs 31 contained higher levels of iron, manganese, copper, and zinc as well as a lower PH than normally occurs in the natural waterways in the area around Meigs 31. The level of those elements and the lower PH would, in normal conditions and pursuant to applicable state and federal laws and regulations, make treatment of the water necessary before it could be released into local streams. Because of the volume of the water, however, treatment of all of the water by Plaintiff's existing treatment facilities was not practicable.

Of course, treatment by the existing facilities was possible; however, due to the volume, such a process would have consumed a great deal of time. The mine naturally makes two to two and one-half million gallons of water per day. Therefore, the rate at which the mine naturally makes water would have prevented any genuine progress against the unanticipated volume of the flood. Essentially, the volume of water which plaintiff was equipped to treat was equal to the normally generated amount of mine seepage. Time became an enemy of Plaintiff, because Plaintiff's analysis indicated that unless the water could be evacuated within, at most, a period of two to four months, Meigs 31 could no longer be mined safely. The basis for that conclusion was that the water threatened the structural integrity of the mine. In time, the roof and wall supports within the mine would deteriorate to a point where safety within the mine could not be ensured. Furthermore, methane naturally develops within the mine, and Plaintiff's ability to evacuate methane from Meigs 31 was eliminated by the inundation on July 11, 1993. Until the water could be evacuated, Plaintiff would be unable to evacuate methane from Meigs 31 and it would build to levels that are incompatible with human occupation of the mine. After a certain amount of time, Plaintiff had good cause to believe that it would no longer be able to make the mine safe for workers who would enter the mine.

Plaintiff operates only two mines, Meigs 31 and the adjacent Meigs Mine Number 2 (hereinafter referred to as "Meigs 2"). The viability of Meigs 2 depends to a great extent upon the continued operation of Meigs 31. Accordingly, Plaintiff's entire operation in Meigs County, one of the largest in the United States, was threatened by the water occupying Meigs 31.

After investigating several alternatives with private consultants, plaintiff settled upon an evacuation method that included the drilling of bore holes at various locations and the evacuation of water, without normal treatment precautions, into streams that feed into the Ohio River. Plaintiff determined

that the effects of such an evacuation would include a total or nearly total kill of aquatic life in the relevant streams, a reduction in PH and some increase in sedimentation of iron, zinc, copper, and manganese in these streams and perhaps the Ohio River.

Plaintiff concluded that the proposed evacuation plan would have no permanent effects on the environment, because the only affected life would renew itself within one to two years. Further, Plaintiff concluded, based upon the fact that the water in the relevant waterways prior to the proposed evacuation was not potable and upon Plaintiff's investigation into existing uses of the water in the streams, that human life would not be affected. Plaintiff recognized that some livestock might drink water from the relevant streams and offered to take any necessary precautions, at Plaintiff's expense, to prevent damage to such livestock. Further, Plaintiff offered to provide water to any other person who claimed to use water from the relevant streams for other purposes.

Plaintiff proposed numerous safeguards against permanent ecological damage. Plaintiff proposed to pump water from its treatment facility, after the evacuation of Meigs 31, at a higher than normal rate, in an attempt to force sediment downstream to and through the Ohio River. Plaintiff caused chemical analysis to be performed of the natural rate of sedimentation, comparison of the rate of natural sedimentation versus that resulting from the proposed evacuation, and the possible effects of such sedimentation. Plaintiff concluded that the long-term effects of the evacuation would be minimal.

Plaintiff had rejected other alternatives for evacuation prior to settling on the method for evacuation that it proposed. Plaintiff rejected all methods that depended upon expanding existing treatment facilities for three reasons. The first such reason was that Plaintiff had already sought approval for expansion from the appropriate governing bodies and, after waiting for as much as three years, had not received such approval. Second, Plaintiff's investigation resulted in the conclusion that existing facilities could not be expanded to treat more than approximately 23 percent of the water in Meigs 31. Finally, Plaintiff concluded that the necessary expansions would require at least several months, a delay that would almost certainly render the mine unworkable.

Plaintiff also rejected *in situ* treatment of the water. *In situ* treatment would have involved the addition of caustic substances to the water in Meigs 31 in order to cause a fallout of the offending elements in the water. *In situ* treatment would, of course, create a sediment that would be left in Meigs 31 after evacuation of the water thus treated. Plaintiff estimated that the amount of sediment (also referred to as "residue" or "sludge") left behind to be 75 to one hundred million gallons. The primary disadvantage to *in situ* treatment was the evacuation and placement of that sediment. Plaintiff's existing facilities would not have accommodated that volume of residue. Further, Plaintiff could not practicably create additional storage facilities for the sludge in compliance with existing approval from governing bodies. Accordingly, Plaintiff rejected the *in situ* treatment alternative.

After rejecting, for various reasons, all alternatives, Plaintiff settled upon the evacuation plan that was eventually proposed. Plaintiff's primary consideration in that choice was time. Plaintiff recognized that other alternatives might eventually lead to the complete evacuation of the mine. However, because Plaintiff's goal was to make the mine workable again, none of the rejected alternatives was deemed viable.

Consistent with the provisions of its NPDES permit, issued by the Ohio Environmental Protection Agency (hereinafter referred to as "OEPA"), Plaintiff sought approval of its emergency bypass plan from OEPA. The proposed plan was an emergency bypass plan in that, pursuant to the plan, Plaintiff sought to bypass its normally used treatment facilities. Plaintiff's NPDES permit provided for emergency bypass in certain situations, and OEPA found that the existing situation warranted emergency bypass. OEPA approved the proposed plan. Specifically, the Director of OEPA concluded that Plaintiff's plan to pump Meigs 31 was permissible under Plaintiff's NPDES permit. On July 26, 1993, the Director of OEPA

issued Findings and an Order authorizing the plan.

Before Plaintiff began pumping, however, the Ohio Division of Reclamation issued an order prohibiting Plaintiff from commencing pumping. The Ohio Division of Reclamation is the state agency charged with enforcing mining laws and regulations in Ohio and is approved by OSM as the primary enforcement body for federal mining and reclamation laws. On July 27, 1993, upon reviewing the Ohio Division of Reclamation's order, the Ohio Reclamation Board of Review granted temporary relief from that order. The Board of Review found that Plaintiff had demonstrated a substantial likelihood of success on the merits and that no significant imminent environmental harm or danger to public health or safety would result from the discharge. As a result of the temporary relief granted by the Ohio Reclamation Board of Review, Plaintiff again prepared to commence pumping.

Before pumping began, OSM issued a cessation order, which had the effect of setting aside the findings of the Ohio Reclamation Board of Review concerning likelihood of harm. Based upon the same evidence that was before the Ohio Reclamation Board of Review, OSM concluded that a threat of significant imminent harm existed and that pumping should not commence.

On July 29, 1993, Plaintiff commenced this action, seeking an order temporarily restraining OSM from duplicating the administrative process previously commenced in the approved Ohio agencies. On July 30, 1993, this Court conducted a hearing on that motion. At the conclusion of the arguments of the parties on that date, this Court issued the requested order. The Court found that OSM had acted without jurisdiction. The basis of this Court's issuance of the July 30, 1993 Order was that OSM was required by the applicable federal law and regulations to consider for approval state agencies to be primary enforcers of federal mining laws and regulations and, where appropriate, to approve those agencies. OSM had considered and approved the Ohio Division of Reclamation as the primary enforcement body in Ohio. Having approved the state agency, OSM was required by law to defer to that agency in any situation where that agency was acting in accordance with prescribed procedure.

At the July 30, 1993 hearing, OSM had argued against the issuance of a temporary restraining order. OSM based its arguments solely on 30 U.S.C. § 1271(a)(1), which allows OSM to act in an emergency situation, even when a parallel agency has been approved, when OSM is in a position to act first. OSM failed to identify any provision of federal laws that would permit OSM to act in an emergency, or any other situation where the parallel state agency is already active and is acting in accordance with the statutorily prescribed procedure. OSM failed to establish that the approved state agency was acting outside the prescribed procedures. The Court found, specifically, that the state agency had made the appropriate analysis. That agency had, of course, reached a different conclusion from that reached by OSM. Having determined that OSM had acted without jurisdiction, the Court held that OSM's cessation order was a nullity and restrained OSM from acting further as long as the approved state agency was acting in accordance with law.

Plaintiff began pumping from Meigs 31, pursuant to the plan approved by OEPA, on July 30, 1993. On August 3, 1993, however, a second federal agency, USEPA, informed Plaintiff that it would issue an administrative order to prevent further pumping until USEPA could further investigate the proposed plan and possible alternatives. USEPA indicated to Plaintiff that it would issue the administrative order on August 4, 1993.

On August 4, 1993, Plaintiff moved this Court for an order joining USEPA and certain of its officials as parties defendant in this matter and temporarily restraining USEPA from acting to prevent evacuation of Meigs 31. After a telephone hearing conducted by the Court on that date, the Court issued the requested order.

In that Order, issued on August 4, the Court found that OEPA had concluded that the proposed plan met the prerequisites under Plaintiff's NPDES permit for emergency

bypass discharge. The Court further found that Plaintiff had agreed to comply with the conditions prescribed by OEPA for approval of the plan. The Court also found that irreparable injury to Plaintiff would result from the failure of the Court to issue the requested order.

On August 4, 1993, Plaintiff also sought preliminary injunctive relief from any further attempts by OSM or USEPA to interfere in the ongoing proceedings in their respective parallel state agencies, as long as those agencies are acting in accordance with applicable law. In its August 4 Order, the Court scheduled the hearing on the motion for a preliminary injunction for August 11, 1993. The Court also issued an Order on August 4, 1993 joining USEPA and certain of its officials as parties defendant in this matter.

On August 6, 1993, USEPA moved this Court for an order vacating its August 4 Order temporarily restraining USEPA's exercise of authority at Meigs 31. The primary basis for USEPA's motion was that this Court had acted without jurisdiction in issuing its August 4 Order, because administrative orders of USEPA are not reviewable, under any circumstances, by the federal courts. USEPA contends that the courts may only review administratively imposed civil penalties. These penalties may be imposed or not imposed in the sole discretion of the USEPA. In the alternative, if SOCCO would choose to violate an administrative order to cease evacuation of the mine, USEPA could seek injunctive enforcement through the courts and, thereby, trigger judicial review. Again, the decision to enforce an administrative order through the courts is wholly discretionary with USEPA. In both scenarios, the USEPA can choose to exercise its unfettered discretion to act, at any time within four years of the events giving rise to administrative action.

This Court heard arguments on USEPA's motion at the hearing commencing on August 11, 1993.

### ANALYSIS

The two motions presently before the Court raise two issues. Those issues are as follows:

1.) Whether this Court has jurisdiction to consider Plaintiff's requests for temporary and preliminary relief against USEPA; and

2.) Whether preliminary injunctive relief is warranted against OSM and USEPA.

### 1. The Jurisdiction of this Court.

USEPA has alleged that this Court did not have jurisdiction to issue the August 4 Order temporarily restraining USEPA from interfering with OEPA's exercise of authority at Meigs 31. Further, in response to Plaintiff's motion for a preliminary injunction, USEPA argues that the federal courts never have jurisdiction to review administrative orders of USEPA. The Court, therefore, must address the question of its own jurisdiction before considering the merits of Plaintiff's request for injunctive relief. Should the Court determine that it is without jurisdiction to issue restraining orders or to grant injunctive relief against USEPA, the Court will vacate its August 4 Order and deny the instant motion for preliminary injunction as it pertains to USEPA.

Although OSM had not formally sought reconsideration of this Court's July 30 Order restraining it from exercising authority at Meigs 31 unless the approved state agency fails to act in accordance with law, nevertheless, by agreement of the parties and with the consent of the Court during the course of this hearing, OSM has been permitted to adduce evidence upon the issue of whether a preliminary injunction should issue as to it.

The Court has considered the arguments put forth by USEPA in its memoranda opposing the relief requested by Plaintiff and in the hearing where the Court considered the motion for preliminary injunction. Based upon the evidence adduced and the arguments of counsel, the Court can only conclude that USEPA misunderstands the basis for this Court's exercise of jurisdiction in this matter. USEPA consistently argues that this Court has no jurisdiction to review administrative orders of USEPA. While that premise is itself questionable and clearly an overly broad statement of the law, it also assumes that the proceeding in which this

Court has been involved since August 4, 1993 is a review of a USEPA administrative order. Of course, that has not been the nature of the proceeding.

On August 4, Plaintiff came to this Court seeking relief from threatened exercise of authority by USEPA that Plaintiff contended was outside the jurisdiction of USEPA. This Court is not, then, reviewing the merits of any orders by USEPA. Rather, the Court is considering whether USEPA has authority to act in any fashion in the ongoing situation at Meigs 31.

The courts have long recognized that the federal courts may properly consider the authority of a federal agency and restrain and enjoin the exercise of that authority when it is outside the jurisdiction of the agency. *See, Leedom v. Kyne,* 358 U.S. 184, 189, 79 S.Ct. 180, 184, 3 L.Ed.2d 210 (1958); *Central Hudson Gas & Electric Corp. v. U.S. EPA,* 587 F.2d 549, 555 (2d Cir.1978); *Coca–Cola Co. v. Federal Trade Commission,* 475 F.2d 299, 303 (5th Cir.1973), *cert. denied* 414 U.S. 877, 94 S.Ct. 121, 38 L.Ed.2d 122 (1973). The Supreme Court recognized that the federal courts must act to restrain federal agency action that is beyond the jurisdiction of the agency when the agency action purports to mandate immediate action in compliance to avoid serious criminal and civil sanctions. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 152–54, 87 S.Ct. 1507, 1517–18, 18 L.Ed.2d 681 (1967). Obviously, the basis for federal court jurisdiction in such a situation is that the harm resulting from the agency's unlawful exercise of jurisdiction may be irreparable if its actions or proposed actions are not subject to review.

This Court has previously acted to enjoin an action of a federal agency when that agency acted or threatened to act beyond its authority. In *Claridge House, Inc. v. U.S. Department of Health and Human Services,* 795 F.Supp. 1393, 1401 (S.D.Ohio 1991) (Holschuh, Chief J.), this Court found that the federal courts have jurisdiction to enjoin the Secretary of Health and Human Services from acting outside the scope of authority granted to him by federal laws and regulations. This Court determined, in *Claridge House,* that prompt action by the federal courts to enjoin agency action outside the agency's jurisdiction is an appropriate and legal exercise of jurisdiction by the federal courts.

In another recent case, this Court determined that an exercise of federal court jurisdiction similar to that sought by Plaintiff in this case is consistent with the federal question jurisdiction of the federal courts. *City of Reynoldsburg v. Carol M. Browner, Administrator, U.S. EPA, et al.,* 834 F.Supp. 963 (S.D.Ohio 1993) (Smith, J.). This Court exercises federal question jurisdiction pursuant to 28 U.S.C. § 1331 whenever the question presented depends for resolution upon construction or application of federal law. *Id.* at 8 (citing *Smith v. Kansas City Title & Trust Co.,* 255 U.S. 180, 199, 41 S.Ct. 243, 245, 65 L.Ed. 577 (1921)).

USEPA has not addressed the issue of this Court's jurisdiction to review an exercise of authority by a federal agency, as opposed to the order resulting from that exercise of authority. None of the cases that USEPA relies upon address that issue. USEPA relies primarily upon two recent appellate court cases. *Southern Pines Associates v. United States,* 912 F.2d 713, 716–17 (4th Cir.1990); *Hoffman Group, Inc. v. EPA,* 902 F.2d 567, 569 (7th Cir.1990). These cases address the question of whether the federal courts may review federal agency orders prohibiting unlicensed or unapproved development of protected wetlands areas. In those cases, no question was before the deciding courts regarding the jurisdiction of the acting federal agency. Inasmuch as they do not address the issue that is before this Court, the cases cited by USEPA are unpersuasive. USEPA has not identified a single case that stands for the proposition that this Court may not review an exercise of agency authority that is allegedly beyond the jurisdiction of the agency.

The overwhelming weight of authority supports this Court's exercise of jurisdiction in this case. The federal courts are granted jurisdiction, pursuant to 28 U.S.C. § 1331, to consider federal questions. Federal question jurisdiction exists where a question before the Court involves a substan-

tial federal element. *See, Gully v. First National Bank*, 299 U.S. 109, 112, 57 S.Ct. 96, 97, 81 L.Ed. 70 (1929). The question of whether a federal agency is acting outside its statutory authority is a federal question. *See, e.g., Leedom v. Kyne, supra.*

This Court recognizes the wisdom of courts that have declined to interfere during the pendency of agency proceedings where the purpose of that intervention would be to second-guess the decisions of those agencies. Contrary to USEPA's assertions, however, the federal courts have not uniformly found that approach to be mandated. In fact, the weight of authority holds that federal courts do have jurisdiction to review agency orders, including administrative orders. The courts have been particularly willing to exercise jurisdiction where administrative remedies are inadequate or will be rendered meaningless by delay. *See, e.g., Walker v. Southern Railway*, 385 U.S. 196, 87 S.Ct. 365, 17 L.Ed.2d 294 (1966).

In *Abbott Laboratories, supra,* and *Darby v. Cisneros*, —— U.S. ——, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993), the Supreme Court has clarified the jurisdiction of the federal courts to review agency orders. That Court has reasoned that judicial review is permissible and appropriate unless Congress has by explicit language precluded such review. *Abbott Laboratories*, 387 U.S. at 141, 87 S.Ct. at 1511.

The Court notes that USEPA has argued that this Court does not have jurisdiction over final decisions from USEPA. USEPA has argued that this Court's jurisdiction is limited to enforcement proceedings upon a violation of an administrative order. The thrust of USEPA's argument is that Plaintiff could only obtain judicial review of USEPA's cessation order by violating that order. Authority, logic, and the statutes providing the basis for this Court's jurisdiction contradict USEPA's contentions.

The Court concludes that it has properly exercised jurisdiction in this case. Plaintiff has supported its argument in favor of jurisdiction with ample citations to relevant authority. USEPA, on the other hand, has failed to address the real issue before the Court. The Court has not been directed to a single case holding that this Court does not have jurisdiction to consider whether a federal agency's action or threatened action is beyond its jurisdiction. On the contrary, courts, including the United States Supreme Court and this Court, have unanimously recognized that the federal courts do have such jurisdiction.

USEPA has attempted to construe the issue at hand as whether this Court may review an administrative order of USEPA. That is clearly not the issue in this proceeding. Nevertheless, the Court finds that USEPA has failed to support its contention that this Court may never review an order of USEPA unless the party whose actions are affected by that order violates the order and USEPA comes to the Court for enforcement or the USEPA issues an administrative civil penalty which is judicially reviewable. For that reason and those set forth above, this Court finds that it acted within its jurisdiction in issuing its August 4 Order temporarily · restraining USEPA's actions.

The USEPA and OSM have cited additional cases as supplemental authorities in support of their Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction. First cited is *Board of Governors of Federal Reserve System v. MCorp Financial, Inc.*, —— U.S. ——, 112 S.Ct. 459, 116 L.Ed.2d 358 (1991). This case turned upon the question of whether the Bankruptcy Code's automatic stay may authorize a district court to enjoin administrative proceedings against a debtor for violations of regulations occurring after the debtor had filed its bankruptcy petition. Secondarily, the case addresses the particular provisions of the Financial Institutions Supervisory Act which specifically preclude judicial review of pending Board administrative actions. *MCorp* does not address the question of judicial review of an alleged infringement by a federal agency on a Plaintiff's rights as posited by Defendants. Moreover, *MCorp* does not involve a situation of irreparable harm to the debtor nor a total deprivation of meaningful and adequate means of vindicating its constitutional and statutory rights. Justice Stevens distinguished this case from *Leedom, supra* by noting that the debtor has a means within its

control to protect and enforce its statutory rights and a clear indication in the statute as to the Congressional intent to preclude judicial review. In our case, Plaintiff has no means *within its control* to protect and enforce its constitutional and statutory rights without recourse to this Court nor is there a clear expression of Congressional intent to preclude judicial review of ultra vires administrative action in either the CWA or the Congressional record.

The second cited case is *Ewing v. Mytinger & Casselberry*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950). Its holding, by its own terms, is limited to situations where "only property rights are concerned." *Id.* at 599, 70 S.Ct. at 872. This Court has addressed the fallacy of this characterization of the SOCCO's position at length elsewhere in this Order and will not restate its findings here. Unquestionably far more is implicated in our case than mere property rights. *Ewing* is wholly inapposite.

The third cited case is *Greater Detroit Resource Recovery Authority v. U.S.E.P.A.*, 916 F.2d 317 (6th Cir.1990), a decision authored by a colleague of this Court. It, too, is inapposite because it deals with a specific statutory provision vesting exclusive jurisdiction in the Court of Appeals to review final administrative action under the Clean Air Act. The Court did, however, note that to the extent a portion of the agency's action was not final, it might be subject to district court review pursuant to the *Leedom* exception, if there had been a manifest infringement of substantial rights irremediable by the statutorily prescribed method of review. *Id* at 323. Without belaboring the point this Court finds the reiteration of the facts and the analysis of the dissent in *Greater Detroit* to be more persuasive and apposite to the present case.

The fourth case cited is *United States v. Town of Lowell, Indiana*, 637 F.Supp. 254 (N.D.Ind.1985). *Lowell* deals with undisputed violations of an NPDES permit and although the state agency had entered into a consent decree with the permit holder regarding some violations, the record shows that violations continued thereafter. In *Lowell*, the state agency had failed to take action in regard to violations subsequent to the consent decree. Additionally, the Court found that none of the exigencies contemplated under the NPDES emergency bypass provisions existed in that case. Since the facts of *Lowell* differ significantly from our case, it too is inapposite.

The final case cited by Defendants. is *Southern Ohio Coal Co. v. Marshall*, 464 F.Supp. 450 (S.D.Ohio. 1978), aff'd., 774 F.2d 693 (6th Cir.1985). Amazingly, *Marshall* stands for precisely the opposite of the Defendants' stated contentions. It holds that the Southern Ohio Coal Co. (the same Plaintiff as in the case at bar) was entitled to an injunction to prevent the enforcement of an order of temporary reinstatement until the coal company had been afforded notice and an opportunity to be heard with respect thereto. Although the federal Mine Safety and Health Administration argued that the Court lacked jurisdiction "because the statutory framework establishes administrative proceedings ultimately terminating in judicial review in the Court of Appeals," *id.* at 454, the Court found that it did have jurisdiction stating that the very administrative procedures by which Plaintiff would have been forced to act and which Defendants contended must be exhausted caused a present and continuing constitutional deprivation. The Court concluded that Plaintiff's procedural due process claim properly invoked the jurisdiction of the Court.

Judge Kinneary astutely observed in *Marshall* that the issue before him centered upon Plaintiff's rights prior to the issuance of the order and the fundamental requirement of due process to be heard at a meaningful time and in a meaningful manner (cite omitted). He wrote that "[t]he Supreme Court has set out three specific factors to be considered in determining whether the procedures followed in this action are constitutionally sufficient:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest including the function involved and the fiscal and

administrative burdens that the additional or substitute procedural requirement would entail. *Mathews v. Elridge*, 424 U.S. 319 at 335, 96 S.Ct. 893 at 903, 47 L.Ed.2d 18 (1976). *Id* at 455–456.

In reviewing the particular facts and posture of the case before him, Judge Kinneary concluded that the private interest in the case was compelling; the existing procedures unreliable; additional procedural safeguards would be of great value in minimizing the risks of erroneous deprivations of Plaintiff's interest; and the public interest or burden associated with this judicial relief was far outweighed by the first two considerations.

In *Marshall*, the government argued that Plaintiff had not shown irreparable harm. However, the Court found that the employee who was to have been temporarily reinstated was in a sensitive safety related position and his inability to perform his. duties and unreliable attendance would put others at risk. Moreover, the temporary reinstatement would have been a source of lowered employee morale. Added to the inherent harm suffered by Plaintiff as a result of a deprivation of its constitutional right to due process, the totality of the circumstances supported a finding of irreparable harm. The facts of the case at bar support a finding of irreparable harm far in excess of the facts in *Marshall*.

The cases cited by Defendants are, at best, inapposite and unpersuasive and, at worst, entirely opposite from Defendant's purported position.

Accordingly, USEPA's motion to vacate this Court's August 4 Order is DENIED.

## 2. USEPA's Authority

USEPA contends that it retains authority to review every decision and order of the approved parallel state agency charged with enforcing the Clean Water Act (hereinafter referred to as the "Act" or the "CWA"). USEPA argues that the Act confers upon it virtually unlimited enforcement authority. The basis for USEPA's argument is apparently that the CWA does not explicitly say when USEPA may review decisions or orders of OEPA.

Plaintiff argues that, while Congress created USEPA as the federal enforcement agency for the CWA, Congress also recognized that primary responsibility for enforcement of the Act at the state level should, if possible, be left with the states. Accordingly, Plaintiff argues, Congress developed a procedure whereby state agencies would be approved to act as the enforcement bodies for the CWA in the states. OEPA is the approved body in Ohio. Plaintiff does *not* argue that USEPA's act of approving OEPA as a parallel divests USEPA of authority in Ohio. Plaintiff argues that USEPA's authority to act is limited, however, in most circumstances when the approved state agency has already acted or is already acting to enforce the CWA in the same situation.

USEPA obtains its enforcement authority from the Act itself. The Act also provides that when USEPA finds that a person is in violation of provisions of the Act, USEPA through its Administrator must issue a compliance order or must notify the approved state agency and permit that agency thirty days within which to commence appropriate enforcement action. 33 U.S.C. § 1319(a)(1) and (a)(3). USEPA argues that it must issue an order directing Plaintiff to cease pumping, because the CWA requires that USEPA act in certain situations. The only possible basis for USEPA's argument is the mandatory language of 33 U.S.C. § 1319, which does not apply to the situation at Meigs 31.

Subsection (a)(3) of § 1319 requires USEPA to issue a compliance order upon a finding that a violation has occurred. Subsection (a)(1) permits USEPA to issue such an order upon a finding of a violation. USEPA has not found a violation of the Act by Plaintiff in the pumping at Meigs 31. In fact, USEPA vigorously argues that it needs additional time to investigate the situation and determine whether a violation has occurred and a compliance order should issue. Accordingly, the Act does not *require* USEPA to act, as USEPA has argued. The Court must now consider whether the USEPA has the authority to act.

At the time of the enactment of the Act, Congress clearly expressed its intention that the states retain primary authority to enforce

the Act. In the statutory policy statement that Congress incorporated in the Act, the policy of state primacy is codified. Subsection (b) of 33 U.S.C. § 1251 provides, as follows:

> It is the policy of Congress to recognize, preserve, and protect the primary responsibilities of States to prevent, reduce, and eliminate pollution....

Under the NPDES program established by 33 U.S.C. § 1342, dischargers of pollutants are required to obtain permits authorizing discharges. A permit issued pursuant to 33 U.S.C. § 1342 must require compliance with applicable standards and requirements of the Act. Pursuant to § 1342, the responsibility for issuing NPDES permits rests with USEPA. States may establish programs in compliance with § 1342(b) and the requirements of 40 C.F.R. Part 122. USEPA must relinquish primary responsibility for issuing NPDES permits to such a state agency. USEPA has delegated authority to administer the NPDES program in Ohio to OEPA.

OEPA has issued a permit to Plaintiff that establishes requirements for treatment and release of water by Plaintiff at Meigs 31. That NPDES permit provides for an emergency bypass in limited situations and in accordance with the requirements of the permit and applicable state and federal law. The plan proposed by Plaintiff for the evacuation of water from Meigs 31 was developed by Plaintiff to comply with the emergency bypass provisions of its NPDES permit. Plaintiff sought and obtained approval from OEPA for its proposed evacuation plan. The Director of OEPA found that the proposed plan complied with the permit and applicable regulations.

USEPA does not dispute that the Director of OEPA has made the appropriate analysis, nor does USEPA argue that the Director's findings were incorrect. Rather, without citing statutory authority for doing so, USEPA asserts that it may issue an order directing Plaintiff to cease its pumping operations that have been found to comply with the emergency bypass provisions of its NPDES permit by the Director of OEPA in order to duplicate OEPA's investigation.

USEPA does not cite and the Court does not find authority for the action that it proposes to take. Undoubtedly, the CWA vests in USEPA the authority to perform an investigation. The Act does not, however, permit USEPA to order cessation of procedures approved by the parallel state agency in order to gain time to perform such an investigation.

■ The legislative history of the Act makes clear that in a case, such as this, where the approved state agency has already taken action, Congress intended for USEPA to act only "in cases where states and other appropriate enforcement agencies are not acting expeditiously and vigorously to enforce control requirements." Senate Report No. 92–414, 92nd Congress, 2nd Session (1972), U.S.Code Cong. & Admin.News 1972, p. 3668. USEPA has not argued and the evidence does not show that OEPA has failed to act expeditiously and vigorously at Meigs 31. On the contrary, the Court finds that OEPA has acted more expeditiously, by far, than USEPA, consistent with the reasons for authorizing state agencies as the primary enforcement bodies for the Act. The inescapable conclusion is that USEPA does not take issue with the haste and vigor with which OEPA has acted at Meigs 31 but with the ultimate conclusion of OEPA's investigation. The Act simply does not provide for review by USEPA of OEPA orders, where OEPA has acted vigorously, diligently, and in accordance with statutory and regulatory procedures.

The logic of the legislative policy discussed above is plain. Two agencies with concurrent jurisdiction may not act simultaneously. In the case of the federal and state courts, one will abstain in favor of the other. Well-established principles govern when the federal courts abstain in deference to the state courts. In the case of USEPA and OEPA, the legislative intent is clearly that the state agency generally be given the first opportunity to act within its jurisdiction. When the state agency has acted, due process requires that the federal agency not simultaneously exercise jurisdiction, absent a statutory scheme providing for override authority on the part of the federal agency. The CWA

**1336**

does not generally provide such override authority to USEPA.

 One exception to the general rule that USEPA does not have override authority over decisions of OEPA is the authority of USEPA to set aside an NPDES permit issued by one state that affects the waters of another state. In such a case, the second state may challenge the allegedly offending permit to USEPA, which has authority to vacate the permit if it concludes that a discharge under the permit will have an undue impact on interstate waters. *See Arkansas v. Oklahoma,* 112 S.Ct. 1046 (1992). USEPA has suggested that its jurisdiction is invoked in this case because the waters of West Virginia may be affected by the pumping of Meigs 31.

For three reasons, the Court does not accept that argument as a basis for USEPA's exercise of jurisdiction in this case. Foremost, USEPA has failed to produce sufficient evidence to support its contention that West Virginia waters may be unduly affected. The Court also notes that the State of West Virginia has not challenged the evacuation to USEPA. Finally, USEPA's override authority in an interstate impact situation extends only to the disapproval of state-issue permits. The challenge in this case, if one had been made, would be to the proposed evacuation plan and not to Plaintiff's NPDES permit.

 Because USEPA has been unable to establish that it has authority to act to prevent pumping at Meigs 31, and because the Court finds no basis in law or policy for such action, the Court finds that USEPA is without jurisdiction to issue an administrative cessation order and that any administrative cessation order issued by USEPA would be a nullity, absent a failure by OEPA to act vigorously and expeditiously.

Plaintiff has submitted as additional authority, the unreported decision of Judge John M. Manos of the Northern District of Ohio in *Ashland Oil, Inc., et al v. James O. McDonald, et al,* (June 11, 1980), Case No. C79-338. This Court finds the logic of that decision to be largely on point in the within matter. That case involved USEPA notices of violation (NOV) to the Plaintiffs. The question was whether Plaintiffs "may maintain a pre-enforcement action to test the validity of notices of violation issued by the Administrator of the U.S.E.P.A." *Id* at 5. The Court concluded that they may.

In *Ashland,* the Court determined that "the Notices of Violation issued to the plaintiffs are final agency actions and that the legislative history of the Clean Air Act is not sufficiently clear and convincing to overcome the presumption of reviewability." *Id* at 5. "The fact that pre-enforcement review is not expressly stated in the Act and that the Act provides a defense to an enforcement action does not constitute clear and convincing evidence of intent to preclude pre-enforcement review." *United States Steel Corporation v. Fri,* 364 F.Supp. 1913, 1018 (N.D.Ind.1973).

Indeed *Abbott, supra,* 387 U.S. at 148–49, defined the "ripeness of the agency action for judicial review in terms of finality ... as well as the nature of the issues to be resolved and the extent of immediate harm to the parties. *Ashland at 7.*

In *Ashland,* the Plaintiffs were attempting to determine if they were subject to enforcement. The issues raised were legal ones concerning the scope of USEPA's authority. The Court concluded that without pre-enforcement review the Plaintiffs faced substantial and immediate harm. The prospect of criminal penalties and a $25,000 per day fine for violation of the NOV were enough for the Court to find immediate and substantial harm.

We do not need to address the issue of finality here, nor the Administrative Procedures Act. We conclude that this matter may be resolved at a stage earlier than that. The predicate for all else is the USEPA's authority to act in the face of a state approved agency's prior action. We conclude that USEPA lacks such authority.

### 3. The Preliminary Injunction Standard

Before it will issue a preliminary injunction, the Court must consider four criteria:

a. whether Plaintiff has shown a strong likelihood of success on the merits;

b. whether Plaintiff has shown irreparable injury;

c. whether issuing a preliminary injunction would cause substantial harm to others; and

d. whether the public interest would be served by issuing a preliminary injunction.

**a. Likelihood of success on the merits**

■ The Court's analysis of USEPA's authority to act under the CWA addresses the issue of likelihood of success on the merits as well. To the extent that USEPA is without authority to override OEPA's approval of Plaintiff's evacuation plan, USEPA cannot succeed on the merits. *See Claridge House,* 795 F.Supp. at 1405. Nevertheless, the Court will make some additional findings on the issue of likelihood of success on the merits.

■ Section 123.44(m)(4) of 40 C.F.R. is the regulation that determines when emergency bypasses are permissible. That regulation provides as follows:

(i) Bypass is prohibited, and the Director may take enforcement against a permittee for bypass, unless:

(A) Bypass was unavoidable to prevent loss of life, personal injury, or severe property damage;

(B) There were no feasible alternatives to the bypass, such as the use of auxiliary treatment facilities, retention of untreated wastes, or maintenance during normal periods of equipment downtime. This condition is not satisfied if adequate back-up equipment should have been installed in the exercise of reasonable engineering judgment to prevent a bypass which occurred during normal periods of equipment downtime or preventive maintenance; and

(C) The permittee submitted notices as required under paragraph (m)(3) of this section.

(ii) The Director may approve an anticipated bypass, after considering its adverse effects, if the Director determines that it will meet the three conditions listed above in paragraph (m)(4)(i) of this section.

The Director of OEPA found that the three prerequisites of 40 C.F.R. 123.-44(m)(4)(i) were met and approved Plaintiff's proposed emergency bypass plan. This Court concurs with the Director of OEPA in his finding that the three prerequisites are established.

The bypass in question was clearly unavoidable to prevent severe property damage. 40 C.F.R. 123.44(m)(4)(i)(A). A significant amount of costly equipment is threatened by the water occupying Meigs 31. Additionally, the Court finds that all of the relevant evidence concerning the structural integrity of Meigs 31 suggests that the mine itself is threatened by the water. Accordingly, the loss of the majority of Plaintiff's property is the likely result of Plaintiff's being prevented from bypassing normal treatment measures.

The Court further finds that virtually all of the relevant evidence supports a finding that no alternative to the bypass was feasible. 40 C.F.R. 123.44(m)(4)(i)(B). Plaintiff explored many possible alternatives and, for legitimate reasons, rejected them. In the end, Plaintiff's choice proved to be bypass or loss of nearly all of its property. The Court also finds that the bypass has not been made necessary by the absence of back-up equipment that should have been available in the exercise of reasonable engineering judgment. *Id.*

The Court finds no indication in the record that Plaintiff failed to submit notices as required under paragraph (m)(3) of 40 C.F.R. 123.44. 40 C.F.R. 123.44(m)(4)(i)(C). Because the Court finds that all prerequisites to the approval of the bypass have been met, the Court concludes, based upon the evidence that is before it, that the Director of OEPA correctly approved the bypass in this case. Accordingly, the Court finds that USEPA is unlikely to be successful in showing that Plaintiff's evacuation is in violation of federal law and Plaintiff is likely to succeed on the merits.

### b. Irreparable injury

USEPA argues, inexplicably, that Plaintiff has not shown that irreparable injury will result from the Court's refusal to issue the requested preliminary injunction. The Court finds that the evidence supports no conclusion more strongly than that such harm will result.

Whenever USEPA has addressed the question, it has argued that no harm will result from the Court's refusal to issue the requested injunction. The basis for that argument is, apparently, that Plaintiff could refuse to comply with any order issued by USEPA and continue pumping, thereby avoiding injury to Meigs 31. The Court is troubled by USEPA's suggestion that Plaintiff violate an order of a federal agency. The Court finds that the proper irreparable injury analysis would assume Plaintiff's compliance with any order issued by USEPA. On that basis, the Court will consider whether irreparable injury will result from the Court's refusal to issue the requested preliminary injunction.

The future viability of Meigs 31 is clearly threatened by the water that currently occupies the mine. Based upon the evidence in the record, the Court can only conclude that the harm resulting from the inundation is likely to become irreparable unless this Court enjoins USEPA from issuing an order designed to stop evacuation of Meigs 31 while USEPA investigates.

 USEPA makes numerous arguments against a finding of irreparable harm. It first argues that Plaintiff's only loss would be economic loss, which does not, in and of itself, constitute irreparable harm. *See Ohio v. Nuclear Regulatory Commission,* 812 F.2d 288, 290–91 (6th Cir.1987). The Court notes two deficiencies in USEPA's arguments. The evidence in the record does not show that Plaintiff's only harm will be economic. In fact, the preponderance of the evidence in the record suggests that Plaintiff is likely to suffer the loss of its entire business if Meigs 31 is not evacuated with great haste. The loss of a plaintiff's entire business is not mere economic loss and may serve as the basis for a finding of irreparable harm. Moreover, if this Court permits USEPA to act outside its authority to Plaintiff's detriment, Plaintiff will suffer the loss of its constitutional right to due process. Action by a federal agency beyond its authority is *per se* an irreparable injury. *See, e.g., Claridge House,* 795 F.Supp. at 1405.

USEPA also argues that Plaintiff is not entitled to injunctive relief, because Plaintiff has allegedly set in motion the chain of events leading to its injury. USEPA alleges that the failure of the bulkhead between Raccoon 3 and Meigs 31 was the cause of the inundation of water in Meigs 31 and that because Plaintiff's injury is self-inflicted no injunctive relief may issue. *See San Francisco Real Estate v. Real Estate Investment Trust of America,* 692 F.2d 814, 818 (1st Cir.1982). USEPA has offered no evidence to support that suggestion, and the Court is unwilling to draw such a conclusion without evidence to support it. In fact, OSM's own draft report (Exhibit 58) indicates that the cause of the inundation was "a roof fall."

### c. Substantial harm to others

USEPA has argued that the harm to others that would result from the evacuation of Meigs 31 is substantial and outweighs any potential harm to Plaintiff. The Court has found that the harm to Plaintiff that will result from the Court's failure to issue the requested preliminary injunction is extraordinarily serious. In order to convince the Court that it should not issue the injunction, USEPA would be required to show the Court that the harm to others would be equally or more significant.

USEPA has urged the Court to consider harm to the environment when it considers the likelihood that harm will result to others from the issuance of the injunction. The Court recognizes that such a consideration is appropriate. Nevertheless, the Court finds that USEPA has not shown that any damage to the environment resulting from the evacuation of Meigs 31 would be either substantial or irreparable. The Court does not suggest that the harm to the environment is not a cause for concern. The preponderance of the evidence shows, however, that any such injury is remediable and that Plaintiff will take appropriate actions to speed the repair of the

environment that would otherwise occur naturally over a period of, at most, two years. Furthermore, USEPA has offered no evidence showing that an endangered or threatened species is currently in danger as a result of the pumping.

In considering potential harm to others, the Court must also consider any potential harm to persons living near the waterways into which Plaintiff is evacuating the water from Meigs 31. USEPA produced witnesses who testified that they anticipated being affected by the evacuation. None of those witnesses testified that she or he was presently being harmed in any significant manner. Further, Plaintiff has offered to take every precaution against significant harm to others. Plaintiff has offered to provide alternate drinking water for livestock, for example. The Court concludes that the injury to others, including the environment, that might result from the evacuation of Meigs 31 according to Plaintiff's plan is insignificant when compared to the harm that will result to Plaintiff if the mine is not evacuated quickly.

### d. Public policy

The public policy concerns implicated by the evacuation of Meigs 31 are addressed in the preceding sections of this Order. The Court will not restate its findings. The Court concludes that the public policy of preserving Plaintiff's business and the jobs of Plaintiff's employees outweighs the opposing public policy, notwithstanding the Court's recognition of the importance of safeguarding the environment against irreparable harm. Because the Court finds that, on balance, the criteria for issuance of a preliminary injunction are satisfied, the Court will issue the requested preliminary injunction with respect to USEPA.

### 4. Applicability of the Preliminary Injunction to OSM

The Court ruled in its July 30 Order that OSM did not have jurisdiction to issue a cessation order when the approved state agency was already acting. Based upon that ruling, the Court issued the Order temporarily restraining OSM from acting, as long as the appropriate state agency was acting in accordance with the applicable statutory procedures.

In determining whether to preliminarily enjoin OSM from attempting to exercise jurisdiction while its parallel state agency is acting, this Court considers the four criteria set forth above. The Court's findings and conclusions, as they apply to USEPA, apply equally to OSM.

The Court finds that Plaintiff's success on the merits is virtually insured, because the appropriate state agency has acted in accordance with law prior to any action by OSM. Applicable law does not vest jurisdiction in OSM to override the factual conclusions of the parallel state agency if those conclusions are the result of the statutorily-required analysis. Accordingly, as regards OSM, the first criteria for issuance of a preliminary injunction favors the issuance of such relief.

The Court's analyses with regard to the other three criteria are identical to that set forth above, and the Court will not restate its findings and conclusions. The Court concludes that the criteria for issuance of a preliminary injunction, on balance, favor of the issuance of such relief with respect to OSM.

### CONCLUSION

For the reasons and based upon the findings set forth above, the Court hereby **DENIES** USEPA's motion to vacate this Court's August 4 Order, and **GRANTS** Plaintiff's motion for a preliminary injunction. Neither USEPA nor OSM shall act to effect the cessation of pumping at Meigs 31 unless their respective parallel approved state agencies fail to act vigorously, expeditiously, and in accordance with law.

The bond previously set in this action shall continue in full force and effect.

This order shall continue in effect until the final determination of this case or until further order of the Court.

**IT IS SO ORDERED.**